**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **KRENAR HOXHA,** | : | |
| Petitioner, | : | **CIVIL ACTION** |
| | : | |
| v. | : | |
| | : | |
| **TROY LEVI,** | : | **No.  05-1211** |
| Respondent. | : | |

<u>**MEMORANDUM AND ORDER**</u>

**Schiller, J.**                                                                        **May 25, 2005**

Krenar Hoxha ("Hoxha"), a naturalized citizen living in the United States with his wife and child, is due to be extradited to his country of birth, Albania, where he will stand trial for murder. Presently before this Court is his habeas corpus petition, which seeks to block that extradition.  For the following reasons, the petition is denied.

**I.       BACKGROUND**

Hoxha was born on March 26, 1970 in Albania and became a naturalized United States citizen on January 17, 2002.  (Compl. ¶ 6, attached as Ex. A to Habeas Pet.)  Albania seeks to try Hoxha for the murders of husband and wife Ilmi and Roza Kasemi, and their son, Eltion Kasemi. (Compl. Ex. B.)  According to the Complaint, Ilmi Kasemi and Hoxha's sister, Mimoza, were involved in a relationship which ended because Hoxha's parents disapproved of it.  (Compl. ¶ 4(a).) Hoxha soon learned that, although both Ilmi and Mimoza married other individuals, the two had rekindled their love affair.  (*Id*. ¶ 4(a-c).)  Seeking revenge, Hoxha broke into Ilmi's home and shot Ilmi, Roza, and Eltion, killing all three.  (*Id*. ¶ 4(d-f).)  Ilmi's surviving daughter, Matilda, witnessed the shootings.  (*Id*. ¶ 4(g).)  After the killings, Hoxha rushed to his cousin's home and asked him to

hide the murder weapon, which was later recovered by Albanian police.  (*Id*. ¶ 4(h).)  Ballistics confirmed that the firearm seized by the police matched the bullets found at the crime scene.  (*Id.* ¶ 4(i).)

Hoxha was tried and convicted *in absentia* by the Court of First Instance of Judicial Circle Fier ("Court of First Instance").  (Habeas Pet. ¶ 4; *see also* Statement of Albanian Prosecutor General Theodhori Sollaku, attached to Compl. as Ex. B.)  Although he was sentenced to life in prison, his conviction was overturned by the Appeal Tribunal of Vlore because he did not receive notice for the aggravated circumstances.  (Compl. Ex. B; *see also* Gov't Resp. in Opp'n to Def.'s Habeas Pet. Ex. B [hereinafter "Gov't Resp."].)  After the second examination of the case, Hoxha was sentenced to twenty-two years, a sentence that was later reduced to fourteen years and eight months.  (Compl. Ex. B.)  The case ended up back before the Appeal Tribunal of Vlore, which overruled the decision of the Court of the First Instance Court and returned the case to the same court but with another panel. (*Id*.; *see also* Gov't Resp. Ex. B.)  Eventually the case came before the Albanian Supreme Court, which sent it back for retrial in the same court but with different judges.  (Compl. Ex. B.; *see also* Gov't Resp. Ex. B.)  The record indicates that the latest ruling occurred on June 25, 2004, when the Appeal Tribunal of Vlore ordered a retrial in the Court of First Instance but with another group of judges, due to Hoxha's absence from his first trial.  (Habeas Pet. ¶ 5 & Ex. B; *see also* Gov't Resp. Ex. B.) Specifically, the Appeal Tribunal of Vlore noted that "[Hoxha] was denied the constitutional right to be called and to attend the proceedings," thereby rendering "the procedural acts of the adjudication of the first instance and the decision [] absolutely invalid, thus making the entire judicial process inexistent [sic]."  (*Id*.; *see also* Habeas Pet. ¶ 5 & Ex. B.)

Albania seeks Hoxha's extradition pursuant to an extradition treaty between the United States

and Albania (the "Extradition Treaty").  Under the terms of the treaty, which has been in force since 1935, the two countries have agreed to "upon requisition duly made as herein provided, deliver up to justice any person who may be charged with, or may have been convicted of, any of the crimes or offenses specified in Article II of the present treaty . . . ." (Gov't Resp. Ex. D, Art. I.)  Persons charged with or convicted of murder are explicitly subject to extradition.  (*Id*., Art. II, 1.)  On October 1, 2004, the Albanian Embassy submitted a diplomatic request with supporting documentation to the United States seeking Hoxha's extradition. (Habeas Pet. ¶ 7; *see also* Compl. Ex. B.)  This constitutes "requisition duly made as herein provided."  (*See* Gov't Resp. Ex. B (certification of Marcie B. Ries, Ambassador of the United States of America).)  On November 9, 2004, Magistrate Judge Thomas J. Reuter of the Eastern District of Pennsylvania issued a warrant for Hoxha's arrest, and Hoxha was arrested the next day.  (Habeas Pet. ¶¶ 1, 7 & Ex. A; *see also* Gov't Resp. at 2.)

On January 19, 2005 and February 4, 2005, extradition proceedings were held before the Honorable Jacob P. Hart, a magistrate judge of this Court, with Hoxha represented by counsel. During the first round of proceedings, Judge Hart examined two issues.  First, he determined that the Extradition Treaty was valid based upon representations from the United States government that Albania has honored the terms of the treaty and that the State Department also intends to adhere to its terms.  (R. at 3 (Jan. 19, 2005 Extradition Hr'g Tr.).)  Second, he turned to the question of whether Albania had probable cause to believe Hoxha is guilty of the crimes charged.  After setting forth the legal standards of probable cause, Judge Hart expressed serious concerns over the failure of the Albanian authorities to present a single sworn document that would help establish probable cause.  (*Id*. at 4-6.)  Judge Hart therefore provided the Government two additional weeks to develop

evidence sufficient to establish probable cause, without which he would order Hoxha's release.  (*Id.* at 11.)  When the proceedings continued two weeks later, Judge Hart found that Hoxha was charged with extraditable offenses within the meaning of the Extradition Treaty, and that, based in part of the newly-provided affidavit of Albanian prosecutor Ardian Visha, probable cause existed to believe that Hoxha committed the crimes for which Albania sought his extradition.  (Certification of Extraditability and Order of Commitment, dated Feb. 9, 2005, attached as Ex. A to Gov't Resp. at 2-3; see also (R. at 35-37 (Feb. 4, 2005 Extradition Hr'g Tr.).)  A copy of Judge Hart's Order permitting extradition was to be forwarded to the Secretary of State and Hoxha was committed to the custody of the United States Marshal pending disposition by the Secretary of State.  (Gov't Resp. Ex. A at 3-4.)  Hoxha filed his habeas petition on March 13, 2005, and the Government was enjoined from deporting Hoxha until further order of this Court.  (*See* Court Order of Mar. 16, 2005.)

## II.   DISCUSSION

### A.   The Extradition Process

A foreign country may seek extradition from the United States only if there is a treaty between the requesting country and the United States.  18 U.S.C. § 3181 (1976); *Matter of Extradition of Singh*, 123 F.R.D. 127, 129 (D.N.J. 1987).  The requesting country must submit its request to a state or federal court, which then determines whether the fugitive is subject to extradition and, if so, orders the fugitive's commitment and certifies the supporting record to the Secretary of State.  18 U.S.C. § 3184.  A fugitive is subject to extradition if probable cause exists to believe that the defendant is guilty of the crime charged.  *Sidali v. INS*, 107 F.3d 191, 195 (3d Cir. 1997).  Ultimately, however, the decision to actually extradite a fugitive lies within the power of the

executive branch, as it is the Secretary of State who makes the final decision whether to surrender the fugitive to the requesting state. *Singh*, 123 F.R.D. at 129-30 ("*The decision to surrender the fugitive then rests in the discretion of the Secretary of State.*") (emphasis in original) (*citing Escobedo v. United States*, 623 F.2d 1098, 1105 & n.20 (5th Cir. 1980)); *see also Sidali*, 107 F.3d at 194 ("Because the power to extradite derives from the President's power to conduct foreign affairs, extradition is an executive, not a judicial, function."). In sum, as explained more fully below, the judicial branch and the executive branch have clearly delineated functions in the extradition process; the judicial branch determines whether the individual is subject to extradition while the executive branch is charged with the decision of whether to extradite.

> **B.    Habeas Review of an Extradition Order**

An extradition order is not a final order of a district court and therefore may not be appealed under 28 U.S.C. § 1291. *See United States v. Bogue*, Crim. A. No. 98-572-M, 1998 WL 966070, at *1 (E.D. Pa. Oct. 13, 1998). Although an extradition order may be challenged via a habeas corpus petition, the scope of review is extremely limited. "Habeas corpus is available only to inquire whether the magistrate [judge] had jurisdiction, whether the offense charged is within the treaty and, by a somewhat liberal extension, whether there was any evidence warranting the finding that there was reasonable ground to believe the accused guilty." *Fernandez v. Phillips*, 268 U.S. 311, 312 (1925); *see also Sidali*, 107 F.3d at 195. It is within this framework that this Court shall consider Hoxha's habeas petition.

Wisely, Hoxha does not attack the jurisdiction of the magistrate judge. A magistrate judge may conduct extradition proceedings if authorized to do so by a court of the United States. 18 U.S.C. § 3184. Local Rule 72.1 of the Eastern District of Pennsylvania provides this authorization.

*Bogue*, 1998 WL 966070, at *1.   Nevertheless, Hoxha makes three arguments that must be addressed.   First, he claims that probable cause did not exist.   Second, Hoxha asserts that the Extradition Treaty between the United States and Albania is no longer in force and, therefore, that the United States is under no duty to grant Albania's request for Hoxha's surrender.   Hoxha concedes that, provided the extradition treaty between the United States and Albania is valid, "the charges [murder] are listed as offenses which qualify as extraditable."  (Mem. of Law in Supp. of Habeas Pet. at 7.)  Finally, Hoxha claims that if extradited, he will face reprisals and death at the hands of Albanian authorities.   He claims that his extradition should therefore be barred by Article III of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment of Punishment, of which the United States is a party.

## 1.   Probable Cause

When determining whether probable cause exists in the context of an extradition proceeding, courts apply the identical standard used in federal preliminary hearings.  *Sidali*, 107 F.3d at 199 (citations omitted).  Under that standard, the burden rests with the government to present "evidence sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the accused's guilt."  *Id*.  In making this determination, the sufficiency of the evidence for conviction purposes is not to be examined; the Government has met its burden if the evidence is sufficient to warrant a finding that there are reasonable grounds to believe the fugitive is guilty and thus hold him for trial.  *Id*. ("The role of the magistrate judge in an extradition proceeding is, therefore, 'to determine whether there is competent evidence to justify holding the accused to await trial, and not to determine whether the evidence is sufficient to justify a conviction.'") (*quoting Collins v. Loisel*, 259 U.S. 309, 316 (1922)); *see also Gouveia v. Vokes*, 800

F. Supp. 241, 244 (E.D. Pa. 1992); *In re Extradition of Chan-Seong I*, 346 F. Supp. 2d 1149, 1161 (D. N.M. 2004). The habeas court does not sit to superimpose its view of the record on that of the extradition magistrate. *Bogue*, 1998 WL 966070, at *2 (*citing Fernandez*, 268 U.S. at 312). Therefore, the writ will not issue if the magistrate relied on competent evidence sufficient to support the conclusion that a reasonable person would believe the petitioner guilty. *Bogue*, 1998 WL 966070, at *2.

Hoxha's argument on the issue of probable cause relies on the purportedly recanted statement of Daut Hoxha, Hoxha's cousin. According to that statement, Hoxha arrived at Daut's home immediately after committing the killings. (Habeas Pet. Ex. I.) Hoxha was holding a plastic bag that contained a gun. (*Id*.) Daut took the bag with the gun and Hoxha headed back toward his house. (*Id*.) Several hours later, Hoxha returned to Daut's home and asked for the gun so that he could throw it in the Gjanica River. (*Id*.) Hoxha and Daut then headed to a nearby village where Daut's cousin, Fetah, lived. (*Id*.) When they arrived at Fetah's home, Daut hid the gun in a sofa. (*Id*.) Daut's statement goes on to recount the bitter family history that led to the killings and also states that Hoxha informed Daut, "you will hear later what I have done." (*Id*.) Hoxha argues that any evidence tying him to the killings flows from the statements of Daut, his sister, and his wife, which were the product of torture and have since been recanted. (Mem. of Law in Support of Habeas Pet. at 7-8.)

In finding probable cause existed, however, Judge Hart assumed that Daut's statements implicating Hoxha were untrue. (R. at 35 (Feb. 4, 2005 Extradition Hr'g Tr.).) In other words,

sufficient evidence existed *aside from* Daut's statements to justify holding Krenar for trial.[1]  The

affidavit of Ardian Visha, Prosecutor at the General Prosecutor's Office in Albania, sets forth the

evidence supporting a finding of probable cause.  Among this evidence is a gun seized from the

home of Fetah Hoxha, which ballistics confirmed was the weapon used to kill the victims; the

statement of Fetah that Daut came to his house with another individual; the declaration of Rahman

Sheqeri, who states that he saw Hoxha with a gun a couple weeks prior to the killings near the

victims' home, and the statement of Murat Kasemi, the victim's brother, who claims to have heard

gun shots on the night of the murder.[2]  (Aff. of Ardian Visha ¶¶ 2-5, 7, attached as Ex. C to Gov't

Resp.)  Furthermore, Matilda Kasemi, the couple's surviving daughter, witnessed the killings and

would be able to identify the killer if provided an opportunity.  (Gov't Resp. Ex. B.)  All of this

_____

[1] It is for this reason that Hoxha's argument that the Magistrate Judge incorrectly refused to allow live testimony from witnesses in Albania is both unpersuasive and irrelevant.  The credibility of witnesses and relevant facts are matters to be determined by an Albanian court.  *See Matter of Sidona*, 450 F. Supp. 672, 685 (S.D.N.Y. 1978) ("The rule is that the accused has no right to introduce evidence which merely contradicts the demanding country's proof, or which only poses conflicts of credibility.").  Rather than permissibly seeking to explain the evidence put forth by the Albanian authorities, Hoxha seeks to try this matter in the United States by contradicting the evidence against him.  This he may not do.  *Id.*  (noting it would contradict purpose of extradition treaties if requesting country were required to conduct a full trial in United States and could only obtain extradition after a full trial in this country).  Furthermore, even accepting certain testimony as recanted, probable cause exists to certify Hoxha as extraditable.

[2] Also challenged are the declarations of Bajame Hoxha and Adriana Hoxha.  Bajame, Daut's wife, asserts that after she heard Daut and Hoxha enter her home in the early morning hours of the night of the killings, she returned to the house a few hours later to find a plastic bag in the corridor of her home.  Adriana Hoxha, Daut's sister, claims that the morning after the killings, she heard a conversation between Daut and Hoxha in which Hoxha told Daut that he would later learn what Hoxha has done.  (*See* Habeas Pet. Exs. F & G (recanting prior declarations).)  Even discounting all three declarations, however, probable cause exists.  Furthermore, the recantations raise credibility issues best left to the Albanian judicial system.  Whether to believe all, any, or none of the witnesses who have now apparently changed their stories is simply not a matter properly decided by this Court.

evidence, properly considered by Judge Hart and this Court, is more than sufficient to constitute probable cause.  Although the statement of Daut Hoxha provides additional support for a finding of probable cause, particularly insofar as Daut led the police to the exact location of the gun, his words are not necessary to sustain this finding.

The Court observes that the case against Krenar appears riddled with holes, especially if one discounts the allegedly recanted statements.  In fact, Judge Hart stressed that were he presented with the evidence before him at a trial conducted in the United States, the Government would not even be able to present its case to the jury, because "[t]here's absolutely no basis to find guilt beyond a reasonable doubt [based on the evidence the Government presented]."  (R. at 36-37 (Feb. 4, 2005 Extradition Hr'g Tr.).)  But that was not the question posed in the extradition hearing nor is it the question posed by the instant habeas petition.  The Government need not put on evidence sufficient to convict Hoxha based on a reasonable doubt standard.  Probable cause is all that is required, and probable cause is what the Government has provided.

2.     *The Validity of the United States/Albania Extradition Treaty*

Hoxha also claims that the Extradition Treaty between the United States and Albania is no longer valid because the Kingdom of Albania no longer exists.  (Mem. of Law in Support of Habeas Pet. at 1.)  According to Hoxha, the current sovereign, the Republic of Albania, is not a contracting party to the Extradition Treaty and all acts of the Kingdom of Albania with foreign governments were revoked and nullified by the governing legislature on May 27, 1944.  (*Id*. at 1-2.)

The flaw in Hoxha's argument lies not with the history lesson he has laid out, *see* Habeas Petition at ¶¶ 13-17, but rather in directing that lesson to this Court.  The continuing validity of a treaty between the United States and another country after a change in the status of that country is

a "political question." *In re Extradition of Platko*, 213 F. Supp. 2d 1229, 1233 n.3 (S.D. Cal. 2002) (citations omitted). Therefore, the Court must defer to the intentions of both countries' respective state departments when deciding the continued validity of a treaty. *U.S. ex rel. Saroop v. Garcia*, 109 F.3d 165, 171 (3d Cir. 1997) ("We will look to the intent and actions of [the countries that have signed the treaty] to ascertain if there was a valid treaty. The nations' conduct proves dispositive."); *see also Terlinden v. Ames*, 184 U.S. 270, 285 (1902) (actions of respective governments deemed controlling when deciding whether extradition treaty has been terminated); *Then v. Melendez*, 92 F.3d 851, 854 (9th Cir. 1996) (continuing validity of a treaty with Singapore after that country's independence from the United Kingdom depended on views of state departments). Judge Hart recognized the limited nature of the judicial branch's review over this question when he refused to hear testimony from Albanian legal experts on the treaty's validity. (R. at 2-3 (Jan. 19, 2005 Extradition Hr'g Tr.).) The record clearly supports the finding that the treaty is valid, as the declaration of Robert E. Dalton, an Assistant Legal Advisor for the governmental office responsible for keeping and preserving records of treaties, states that "[t]he United States Government considers that the Extradition Treaty between the United States of America and Albania that was signed at Tirana March 1, 1933, and entered into force November 14, 1935, is currently in force between the United States of America and Albania." (Dalton Decl. ¶ 3, attached as Ex. F to Gov't Resp.) Included with Dalton's declaration is a copy of the relevant portion of the Department of State publication, *Treaties in Force*, which lists the extradition treaty between the United States and Albania as a currently valid treaty. (*Id.*) Furthermore, the declaration of Virginia Prugh, Attorney Adviser in the Office of the Legal Adviser for the Department of State, also asserts that the Extradition Treaty is "in full force and effect." (Prugh Decl. ¶¶ 2-4, attached as Ex. E to Gov't

10

Resp.)  Congress has also listed the extradition treaty with Albania as one of the bilateral extradition treaties the United States maintains with foreign countries.  18 U.S.C. § 3181.  Finally, Judge Hart noted that Albania has extradited individuals under the Treaty, a clear indication that Albania believes the treaty is in full force and intends to honor its provisions.  (R. at 3 (Jan. 19, 2005 Extradition Hr'g Tr.).)  Accordingly, the appropriate governmental entities of both the United States and Albania have spoken on this matter and have indicated that the Extradition Treaty is in full force and effect.

3.      *Humanitarian Exception to Extradition Laws*

Finally, Hoxha argues that he should not be extradited because he would face torture and possible death should he be returned to Albania.  Article III of the UN Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment ("Convention Against Torture") forbids the extradition of a person to a country if there are substantial grounds to believe that the person will be tortured upon return.  According to Hoxha, this provision has been both ratified and codified into law by the United States.  (Mem. of Law in Support of Habeas Pet. at 4.)  Hoxha further argues that this Court should create a "humanitarian exception" that would allow the Court to ignore the extradition order because the actions to which Hoxha might be subjected in Albania would greatly offend the Court's sense of decency.  (*Id*. at 6.)

Hoxha's argument, while appealing on a certain level, fails to square with the law, and is a matter clearly committed to the discretion of the Secretary of State.  The State Department has enacted regulations, pursuant to the Foreign Affairs Reform and Restructuring Act, 8 U.S.C. § 1231 (2005), aimed at implementing the Convention Against Torture.  The clear policy of the United States is "not to expel, extradite, or otherwise effect the involuntary return of any person to a country

11

in which there are substantial grounds for believing the person would be in danger of being subject to torture, regardless of whether the person is physically present in the United States."  Act of Oct. 21, 1998, Pub. L. No. 105-277, 112 Stat. 2681.  The regulations, however, mandate that "the Secretary is the U.S. official responsible for determining whether to surrender a fugitive to a foreign country by means of extradition."  22 C.F.R. § 95.2(b) (2005).  In other words, while the judicial branch is charged with deciding whether an individual is extraditable, the decision to extradite the individual rests with the executive branch.  *Quinn v. Robinson*, 783 F.2d 776, 789 (9th Cir. 1986). It is within the sole discretion of the Secretary of State to refuse to extradite an individual on humanitarian grounds in light of the treatment and consequences that await that individual.  *Singh*, 123 F.R.D. at 130 (*citing Quinn*, 783 F.2d at 789-90); *see also In re Extradition of Chan-Seong-I*, 346 F. Supp. 2d at 1153-54 ("Whether humanitarian concerns should preclude extradition is an issue committed to the sole discretion of the executive branch, specifically the Secretary of State."). Indeed, regulations are in place for situations when allegations of torture are asserted.  In such cases, "appropriate policy and legal offices review and analyze information relevant to the case in preparing a recommendation to the Secretary as to whether or not to sign the surrender warrant."  22 C.F.R. § 95.3(a).  Then, the Secretary is charged with surrendering the individual, denying surrender of the individual, or surrendering the individual subject to conditions.  22 C.F.R. § 95.3(b).  The Secretary's decision, in this regard, is not subject to judicial review.  22 C.F.R. § 95.4 ("Decisions of the Secretary concerning surrender of fugitives for extradition are matters of executive discretion not subject to judicial review.").

In sum, the separate branches of government each have clearly defined roles in the extradition process.  It is the duty of the judicial branch to ensure that the individual sought is subject to

extradition, while it is the duty of the executive branch, which possesses great power in the realm of foreign affairs, to ensure that extradition is not sought for political reasons and that no individual will be subject to torture if extradited. *See Singh*, 123 F.R.D. at 133 ("It is the settled rule that it is within the Secretary of State's sole discretion to determine whether or not a country's requisition for extradition is made with a view to try or punish the fugitive for a political crime, i.e., whether the request is a subterfuge.") (internal quotations omitted).  Accordingly, this Court rejects Hoxha's invitation to create a judicial humanitarian grounds exception to the laws of extradition.[3]

## III.    CONCLUSION

Jurisdiction of the Magistrate Judge in this case was clearly proper, the crime of murder falls within the terms of the Extradition Treaty, and probable cause exists that Krenar Hoxha is responsible for the three murders for which Albania seeks his extradition.  This Court's scope of review limited to those issues, the Court must therefore deny Hoxha's habeas petition.  An appropriate Order follows.

---

[3] The U.S. State Department is aware that Albanian police have beaten and tortured suspects and that prison conditions in Albania are poor.  *See* U.S. Dep't of State, Country Report on Human Rights Practices in Albania - 2004 (Feb. 28, 2005), *available at* http://www.state.gov/g/drl/rls/hrrpt/2004/41666.htm.  Sending *any* individual to a country where he or she faces even the prospect of cruel or inhumane treatment cannot be squared with the ideals of freedom and respect for the individual embodied by our laws and cherished by our citizens.  As President Bush has declared, "torture is never acceptable, nor we do hand over people to countries that do torture."  *See* Jane Mayer, *Outsourcing Torture*, THE NEW YORKER, Feb. 14, 2005, *available at* http://www.newyorker.com/printables/fact/050214fa_fact6.  Nevertheless, it has been alleged that U.S. and Albanian agents have collaborated to further the U.S. policy whereby persons suspected of terrorism are sent to countries that engage in deplorable and illegal interrogation practices.  *See id.*; *see also* Megan K. Stack & Bob Drogin, *Detainee Says U.S. Handed Him Over for Torture*, L.A. TIMES, Jan. 13, 2005, at A1.  Accordingly, this Court trusts that the State Department will seriously examine the charges of torture that Hoxha has levied against Albanian authorities and faithfully uphold this Government's clear policy of refusing to extradite a person when there are substantial grounds for believing that person would be subjected to torture.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **KRENAR HOXHA,** | : | |
| Petitioner, | : | **CIVIL ACTION** |
| | : | |
| v. | : | |
| | : | |
| **TROY LEVI,** | : | No.  05-1211 |
| Respondent. | : | |

## <u>ORDER</u>

**AND NOW**, this **25**th day of **May**, **2005**, upon consideration of Krenar Hoxha's Petition for Habeas Corpus (Document No. 1), the Government's response thereto, the record before Magistrate Judge Jacob P. Hart, and for the foregoing reasons, it is hereby **ORDERED** that the Petition is **DENIED** and that the stay imposed by this Court's March 16, 2005 Order is **LIFTED**.

**BY THE COURT:**

_____
**Berle M. Schiller, J.**